AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Northern District of California

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| GEORGINA RODRIGUEZ, a/k/a Georgina Rodriguez Ramirez, a/k/a Gina Rodriguez, a/k/a Georgina Ramirez | ) ) ) ) ) | Case No. 3-20-71033 MAG |
| Defendant(s) | | |

FILED
Jul 29 2020
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of __March 7, 2017__ in the county of __San Mateo__ in the __Northern__ District of __California__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1341 | Mail Fraud |

This criminal complaint is based on these facts:

Please see attached affidavit of Special Agent Jason E. Richards in Support of an Application for a Criminal Complaint and Arrest Warrant

☑ Continued on the attached sheet.

/s/
Complainant's signature

Jason E. Richards, Special Agent, FBI
Printed name and title

Approved as to form  _Kyle F. Waldinger_
AUSA Waldinger

Sworn to before me by telephone.

Date: July 28, 2020

Judge's signature

City and state: San Francisco, California

Jacqueline Scott Corley, U.S. Magistrate Judge
Printed name and title

**AFFIDAVIT OF SPECIAL AGENT JASON E. RICHARDS
IN SUPPORT OF AN APPLICATION FOR
A CRIMINAL COMPLAINT AND ARREST WARRANT**

I, Jason E. Richards, a Special Agent of the Federal Bureau of Investigation ("FBI"), being duly sworn, hereby declare as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a criminal complaint against Georgina Rodriguez ("RODRIGUEZ"), who is also known as Georgina Rodriguez Ramirez, Gina Rodriguez, and Georgina Ramirez. As set forth below, there is probable cause to believe RODRIGUEZ engaged in a scheme to defraud individual investors and obtain money or property from those investors through false or fraudulent pretenses, representations, or promises. Once in control of the investors' money, RODRIGUEZ quickly transferred portions of it to other business ventures in which she was involved, all pursuant to an ongoing mail fraud scheme in violation of Title 18, United States Code, Section 1341. Specifically, as set forth in detail below, RODRIGUEZ represented to potential investors that an entity known as Menlo Capital – 67th Street, LLC ("Menlo Capital") was raising up to $1 million and that the funds raised would be loaned to another company controlled at least in part by RODRIGUEZ – 4850 67th Street, LLC ("4850"). Most of the money raised by Menlo Capital was directed to companies that were unrelated to 4850 other than for the fact that those companies also were controlled at least in part by RODRIGUEZ.

2. The contents of this affidavit are based upon the following: my own investigation; my review of documents and computer records related to this investigation; my conversations with other law enforcement personnel; oral and written communications with

others who have personal knowledge of the events and circumstances described herein (including interviews of witnesses); review of public information, including information available on the Internet; review of records received via legal process; and my experience and background as a Special Agent of the FBI.  Statements made by witnesses and other individuals referenced in this affidavit have been paraphrased.  Since this affidavit is being submitted for the limited purpose of securing a Criminal Complaint and associated arrest warrant, I have not included every fact known to me concerning this investigation.  I have set forth only the facts I believe are necessary to establish probable cause for the requested Criminal Complaint.

3. I am an "investigative or law enforcement officer of the United States" within the meaning of Section 2510(7) of Title 18 of the United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

4. I am a Special Agent of the FBI and have been so employed since September 1998.  As part of my duties, I investigate offenses involving financial fraud schemes, including investment fraud, corporate fraud, bank fraud, money laundering, and other schemes.  I have experience investigating financial-related crimes and have received specialized training on the conduct of these investigations.  Prior to my employment as a Special Agent, I was an accountant.

## COUNT ONE

5. Beginning in or about March 2017, and continuing through the present, in the Northern District of California and elsewhere, the defendant, Georgina RODRIGUEZ, did knowingly and with the intent to defraud participate in, devise, and intend to devise a scheme and artifice to defraud investors as to a material matter, and to obtain money and property from

investors by means of materially false and fraudulent pretenses, representations, and promises. Specifically, on or about March 7, 2017, in the Northern District of California and elsewhere, for the purpose of executing the aforementioned scheme and artifice to defraud and attempting to do so, the defendant RODRIGUEZ did knowingly cause to be delivered by the U.S. Postal Service according to the direction thereon mail matter containing correspondence addressed to a potential investor (identified in this affidavit as "VICTIM 1"), all in violation of Title 18, United States Code, Section 1341.

## APPLICABLE LAW

6.  Title 18, United States Code, Section 1341 prohibits mail fraud. That statute provides, in relevant part, "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, . . . <u>for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both.</u>"

## FACTS ESTABLISHING PROBABLE CAUSE

**VICTIM 1's Investment with Menlo Capital and RODRIGUEZ**

7.  In June and July of 2020, the FBI interviewed VICTIM 1, who relayed the

3

following, in substance and in part:

- VICTIM 1 has several investments with an entity identified in this affidavit as Company 1.

- In 2017, VICTIM 1 became interested in a new investment with the company called Menlo Capital – 67th Street, LLC, previously referred to in paragraph 1. VICTIM 1 was to receive interest of 10% a year and the investment was guaranteed by Company 1.

- VICTIM 1 invested $300,000.

- RODRIGUEZ picked up VICTIM 1's investment check at Company 1's office. Based on my knowledge of the investigation, I know Company 1's office to be in the Northern District of California.

- VICTIM 1 received hardcopy communications regarding Menlo Capital by mail.

- At the time of the investment, VICTIM 1 resided in and received mail in San Mateo County, California.

- During the time that VICTIM 1's money has been invested with Menlo Capital, VICTIM 1 has had to constantly remind RODRIGUEZ to pay the interest payments that were due every month.

- On several occasions, VICTIM 1 requested the $300,000 investment be returned, but it never happened.

- In approximately March of 2017, VICTIM 1 received a letter in the mail dated March 7, 2017.

4

8. VICTIM 1 provided the FBI with a copy of this letter, which I have reviewed. The letter states as follows:

> [Individual 1, who I know to be the President of Company 1] is currently offering an investment on a loan secured by a Judgment that is owned by [Individual 1]. We are looking for a minimum investment of $10,000 and will pay interest at 10% annual interest. [Company 1] will guarantee the loan. In addition, a $500,000 line of credit with California Bank & Trust is available if some unexpected reason, you need your funds returned to you before the loan matures or is paid off. . . .

The letterhead on the first page of the letter was "Menlo Capital" and "4850 67th Street, LLC." The letter bore a signature line reading "Gina Rodriguez" in typed print, and appears to bear a signature reading "Georgina Rodriguez." The letter advised VICTIM 1 to call RODRIGUEZ if VICTIM 1 had any questions. The letter also provided a telephone number that, based on my investigation, I know to be associated with RODRIGUEZ and a corporation named West Edge Halo, Inc. ("WEH"). (For example, in the course of this investigation, I have obtained correspondence written by RODRIGUEZ on WEH letterhead, which correspondence bore the same telephone number as that which was on the March 7, 2017, letter referenced above.)

9. Included with the letter was a summary of 4850 67th Street, San Diego, California. The summary explained that Individual 1 purchased the property in 2015 and had won a judgment against a non-profit company (hereafter "Non-Profit") for its failure to make its lease payments on the 67th Street property. The summary explained that the total amount of the judgment was approximately $2.5 million, that more than $366,000 had already been paid on the judgment, and that it was expected that the judgment would be paid off within about two years. The summary explained that, in an effort to remain "very liquid," Individual 1 was "looking to raise funds using this judgement [sic] as collateral, backed up by a $500,000 line of credit . . . ."

5

10. On or about March 10, 2017, RODRIGUEZ sent an email to VICTIM 1 and attached a Private Placement Memorandum ("PPM")[1] concerning the investment with Menlo Capital that had been outlined in the March 7 letter. VICTIM 1 provided the FBI with a copy of the PPM issued by Menlo Capital describing the investment offering. I have reviewed the PPM.[2] The introduction of the executive summary read in part

> MENLO CAPITAL – 67th Street LLC [*i.e.*, Menlo Capital] has agreed to make a loan to 4850 67th Street, LLC [*i.e.*, 4850] in the amount of up to $1,000,000. . . . As security for the Note, [4850] shall give [Menlo Capital] a security interest in that judgment (the "Judgment") obtained by [4850] against [Non-Profit] . . . in the original amount of $2,242,263.49. . . . Notwithstanding whether payments are made under the Judgment, an investor shall have the right at any time to request that [Menlo Capital] repurchase such investor's investment upon 90 days-notice [sic]. As further security for each investor, [Company 1], the manager of [Menlo Capital], shall guarantee this repurchase option given to each investor by [Menlo Capital].

11. According to the PPM, investors were to receive a guaranteed return interest on their investment of 10% per year.

12. Page 12 of the PPM contained a section titled "Use of Proceeds." This section stated

> [Menlo Capital] will fund *all amounts invested* pursuant to this offering *with [4850]*. . . . [4850] intends to use the proceeds to pay Offering Costs, fund the interest reserve required under the Note, pay operating costs with respect to the San Diego Property, pay [4850]'s attorneys' fees and costs arising from obtaining and collecting the Judgment, establish reserves and to distribute to its

---

[1] A private placement (or non-public offering) is a funding round of securities that are sold through a private offering rather than through a public offering. A private placement memorandum or PPM is a legal document that states the objectives, risks, and terms of an investment involved with a private placement.

[2] In the PPM, Menlo Capital was referred to as the "Company" and 4850 was referred to as the "Borrower." However, for purposes of this affidavit, I will continue to use the terms "Menlo Capital" and "4850" when quoting and discussing the terms of the PPM.

6

Members (including [Individual 1]) some of the additional advances made by [Individual 1] to [4850]." (emphases added)

13. According to the PPM, the Manager of Menlo Capital was Company 1. The PPM stated that 4850 was managed by RODRIGUEZ and that the members of 4850 were West Edge Halo Inc. ("WEH") and Individual 1. The PPM stated that RODRIGUEZ was the President of WEH and that Individual 1 was the President of Company 1.

   a. As noted above, the PPM stated that RODRIGUEZ's company WEH was one of the members of 4850. Although the PPM stated that the party providing the loan to 4850 (*i.e.*, Menlo Capital) was managed by Company 1 (*i.e.*, Individual 1's company), my investigation shows that RODRIGUEZ exercised substantial control over Menlo Capital, as set forth below.

   b. For example, the Articles of Organization filed on behalf of Menlo Capital with the California Secretary of State on or about March 14, 2017, listed Gina Rodriguez as the agent for service of process for Menlo Capital and stated that Menlo Capital would have more than one manager (thus suggesting that there could be another manager in addition to Company 1). Menlo Capital's business address was listed as 40 29th Street, San Francisco, California. (From my investigation, including my personal observations and interactions with RODRIGUEZ, I know this to be RODRIGUEZ's known business address.) Moreover, those Articles of Organization appeared to have been signed by RODRIGUEZ. The Statement of Information for Menlo Capital filed with the Secretary of State in August 2018, listed only Gina Rodriguez as the manager or member of the LLC.

   c. The Statement of Information for Menlo Capital filed in December 2019 listed

7

       Georgina Rodriguez as the agent for service of process and Chief Executive Officer of Menlo Capital.  Georgina *Ramirez* was listed as a manager or member.  However, the section calling for the identity of the person completing the form listed RODRIGUEZ, with the title "Manager."  Based on my investigation, I know "Ramirez" to be an alternate surname used by RODRIGUEZ.

   d.   I also note that the March 7, 2017, letter from Menlo Capital to VICTIM 1 was signed by RODRIGUEZ, and that RODRIGUEZ was the person who emailed the PPM to VICTIM 1 and who ultimately took receipt of VICTIM 1's investment check.

   e.   Furthermore, although RODRIGUEZ and Individual 1 were both authorized signors on Menlo Capital's California Bank & Trust bank account numbered ending in 9785, the deposits and checks I have reviewed from that account were signed by RODRIGUEZ only.  (Based on my review of the records, Individual 1 was not an authorized signor on 4850's bank account located at California Bank & Trust.)

   f.   Moreover, in an interview conducted on July 2, 2020, Individual 1 stated that he never received an accounting from RODRIGUEZ of how Menlo Capital used the money raised.

   g.   Based on all of the above, I submit there is probable cause to believe that RODRIGUEZ exercised substantial control over Menlo Capital and its bank account.

14.   Based on materials provided by RODRIGUEZ, on March 16, 2017, VICTIM 1 invested $300,000 with Menlo Capital.  I have reviewed bank records obtained by legal process

during the course of this investigation regarding Menlo Capital's account numbered ending in 9785 at California Bank & Trust. Those records confirm that VICTIM 1's $300,000 investment was deposited in Menlo Capital's bank account on or about March 16, 2017.

15. The next day, on or about March 17, 2017, $75,000 traceable to VICTIM 1's investment was transferred from the account numbered ending in 9785 to a bank account in the name of WEH, which is an entity ostensibly controlled by RODRIGUEZ.[3] Then on or about March 24, 2017, an additional $40,000 traceable at least in part to VICTIM 1's investment was transferred to the same WEH bank account. The WEH account had a $5,000 balance before the $115,000 was deposited. Between on or about March 17, 2017 and on or about March 28, 2017, RODRIGUEZ wrote six checks totaling $16,300 that were payable to herself from the WEH account.

**Use and Movement of the Funds of Other Presumed Investors**

16. Menlo Capital's bank account numbered ending in 9785 had additional money deposited aside from the $300,000 investment from VICTIM 1. Based on my review of bank records obtained regarding the 9785 account, between March and May of 2017, checks totaling approximately $400,000 from about 10 other individuals were deposited into that account.

---

[3] For example, as noted in paragraph 13, the PPM identified RODRIGUEZ as the President of WEH. Furthermore, as noted in paragraph 8, in the course of this investigation, I have obtained correspondence on WEH letterhead bearing RODRIGUEZ's signature. That correspondence identified RODRIGUEZ as WEH's President. Moreover, the Statement of Information filed by WEH with the California Secretary of State on June 21, 2016, stated that RODRIGUEZ was the CEO and Secretary of the WEH, and was one of WEH's directors. That Statement of Information was signed by Georgina RODRIGUEZ, who was also identified on the signature line as "manager." The Statement of Information filed on August 17, 2018, for WEH indicated that there was no change with respect to the Statement of Information filed in 2016. (Corporate documents such as those described above are publicly available from the California Secretary of State website at https://businesssearch.sos.ca.gov.) Lastly, RODRIGUEZ is the sole signatory on the account where the $75,000 was deposited.

Several of the deposited checks listed addresses for the payors in the Northern District of California. A $20,000 check deposited had "2 units" in the memo line which comports with how the PPM presented the investment, *i.e.*, "1 Unit = $10,000." Although these other presumed investors have not yet been interviewed by the FBI, based on my training and experience, interviews of VICTIM 1 and Individual 1, review of the PPM, and review of bank and other records, it is probable those individuals made investment decisions based on material similar to that which was received by VICTIM 1.

17. The $400,000 referenced in the previous paragraph was transferred in a similar fashion as VICTIM 1's investment. Specifically, $325,000 of the $400,000 was transferred to WEH, and then the following transactions took place in the WEH account: $18,000 of the $325,000 was wire transferred to Chicago Title escrow company. $10,500 was paid to RODRIGUEZ in the form of a check. $2,500 was transferred to an account in the name of 5400 Kiernan, another company ostensibly controlled by RODRIGUEZ.[4] $4,000 was transferred to an individual identified here as "R.R.," whom I know to be a relative of RODRIGUEZ. $7,200 was transferred to WEH's bank account at California Bank & Trust ending in 6986. $200,000 was sent to Company 1.

18. Based on my analysis of records obtained regarding various bank accounts (including those of Menlo Capital, 4850, and WEH), it appears to me that only $288,000 of VICTIM 1's and other outside investors' investments were paid by Menlo Capital to 4850. And even though this money was *deposited* into 4850's bank account, a large portion was ultimately

---

[4] The California Secretary of State's website indicates that 5400 Kiernan, LLC, was registered in December 2014. The Articles of Organization filed that month identify Gina Rodriguez as the organizer and agent for service of process. The Statement of Information filed in April 2019 identifies Georgina Rodriguez as the "Manager(s) or Member(s)" and the CEO of the LLC.

diverted to other companies controlled by RODRIGUEZ.  A review of bank records for 4850 where the $288,000 was deposited showed $65,000 being transferred to 5400 Kiernan LLC, $30,000 being transferred to an individual identified here as "N.A.," and $75,000 being transferred to WEH.  In other words, despite the fact that the PPM represented to VICTIM 1 and other investors that Menlo Capital would "fund ***all amounts invested*** pursuant to this offering with *[4850]*" and that 4850 intended "to use the proceeds to pay Offering Costs, fund the interest reserve required under the Note, pay operating costs with respect to the ***San Diego Property***, pay [4850's] attorneys' fees and costs arising from obtaining and collecting the Judgment, establish reserves and to distribute to its Members" (*see* paragraph 12 (emphases added)), the majority of funds invested appear to have been used, within days or months, for other purposes.

### The Judgment

19.     As noted above, the PPM provided to VICTIM 1 stated that as security for the loan Menlo Capital was making to 4850, 4850 would give Menlo Capital a security interest in the judgment obtained by 4850 against Non-Profit.  As noted above in paragraphs 10 and 13, Company 1 was represented to be the manager of Menlo Capital in the PPM.  Despite this fact, I submit that there is probable cause to believe that RODRIGUEZ exercised substantial control over Menlo Capital (the entity that was loaning VICTIM 1's and other investors' investments to 4850).  Moreover, RODRIGUEZ's company WEH was one of the members of 4850 (the entity that was receiving the loan).  Based on these facts, and based on the representations made to VICTIM 1 in the PPM about the judgment obtained by 4850 that was allegedly securing VICTIM 1's investment, I have conducted some investigation into 4850's receipt of funds related to that judgment and about 4850's use of funds traceable to the judgment.  In short, my investigation shows that 4850 received complete payment on the approximately $2.2 million

judgment, but did not use any of those funds to pay back Menlo Capital or the individuals who appear to have invested in Menlo Capital's loan to 4850 secured by that judgment.

20. As noted above, the March 7, 2017, letter received by VICTIM 1 and the PPM provided to VICTIM 1 referred to a judgment against Non-Profit that 4850 had won. I have interviewed an attorney identified in this affidavit as "S.G." S.G. represented 4850 on matters related to this judgment. I learned from S.G. that, in June 2018, a payment of $1,328,464.98 associated with the judgment was made to S.G.'s attorney trust account. S.G. told me that most, if not all this money, was then paid to 4850.

21. I have reviewed bank records obtained by legal process during the course of this investigation regarding 4850's bank account numbered ending in 6481 at California Bank & Trust ("CB&T"). Those records showed a $1,042,941.41 incoming wire transfer on June 15, 2018, from S.G's trust account. I believe this to be a partial payment of the amount referenced in paragraph 20 above, minus attorneys' fees and other expenses. My review of bank records indicates that the funds received on June 15, 2018 by 4850 were not directly used to pay interest or principal to Menlo Capital or any of the individuals that appear to have invested with Menlo Capital (including VICTIM 1). A summary of the disposition of these funds is set out below:

   a. Shortly after the $1,042,941.41 wire transfer to the 6481 account, RODRIGUEZ signed three checks payable to cash totaling $12,500. The three checks were negotiated and endorsed by RODRIGUEZ.

   b. On June 20, 2018, $200,000 was wired from the account ending 6481 to a second account in the name of 4850, located at Bank of America ("BofA"). On the same day, $70,000 of the $200,000 was transferred from the latter account to an account in the name of 2555 Pulgas EPA LLC ("2555") located at BofA. 2555 is

        another company ostensibly controlled by RODRIGUEZ and that is not associated with 4850.  For example, according to a business information form filed in or around November 2018 with Umpqua Bank, RODRIGUEZ disclosed she was the 100% owner of 2555 and it operated senior care facilities in Northern California.  (This business information form was part of a loan file I obtained by legal process during the course of this investigation.)

    c.  On June 26, 2018, $100,000 was wired from the CB&T account ending 6481 to the 4850 account at BofA.  Over the next three days, $70,000 of the $100,000 was wired from the latter account to 2555's account at BofA.

    d.  On July 6, 2018, $150,000 was transferred from the CB&T account ending 6481 to the 4850 account at BofA.  On the same day, $150,000 was transferred from the latter account to 2555's account at BofA.

    e.  On July 10, 2018, $158,000 was wired from the CB&T account ending 6481 to the 4850 account at BofA.  On the same day, $89,000 was transferred from the latter account to 2555's account at BofA, and $5,000 was withdrawn in cash from 2555's account at BofA.

    f.  On July 18, 2018, $83,492.97 was transferred from the CB&T account ending 6481 to the 4850 account at BofA.  On the same day, $83,492.97 was transferred to 2555's account at BofA.

22.    The $1,042,941.41 deposited to 4850's bank account is believed to be part of the security interest or collateral for the loan that Menlo Capital was making to 4850 with the investment funds obtained from VICTIM 1 and other presumed investors.  I submit that the preceding paragraphs 20-21 show that at least approximately $1 million of the collateral was

syphoned off to other business ventures controlled by RODRIGUEZ.

**Company 1**

23. As stated above, the PPM stated the members of 4850 were WEH and Individual 1. The PPM stated Individual 1 was the President of Company 1 and that Company 1 was the manager of 4850.

24. In the course of my investigation, I have learned that on June 26, 2020, Individual 1 spoke to VICTIM 1 by telephone and disclosed that RODRIGUEZ diverted some of the funds from 4850. Individual 1 described the transactions to VICTIM 1 as "fraud."

25. I was later present for a videoconference interview of Individual 1 on July 2, 2020. During the course of that interview, Individual 1, whose company managed 4850, stated that there was no reason for WEH to obtain any money from VICTIM 1's $300,000 investment. Individual 1 confirmed that he/she believed RODRIGUEZ diverted money from 4850 and that RODRIGUEZ had not provided Individual 1 with an accounting of the funds even though Individual 1 has made multiple requests.

26. Victim 1's $300,000 investment has not been returned. Individual 1 is selling personal assets to repay the investors because Company 1 guaranteed the investment.

## CONCLUSION

27. Based on the foregoing facts, my training and experience, and the training and experience of agents and investigators involved in this investigation, I respectfully submit there is probable cause to believe that GEORGINA RODRIGUEZ, who is also known as Georgina Rodriguez Ramirez, Gina Rodriguez, and Georgina Ramirez, has committed the crime of mail fraud, in violation of Title 18, United States Code, Section 1341. Specifically, there is probable

cause to believe that, on or about March 7, 2017, RODRIGUEZ did knowingly cause to be delivered by the U.S. Postal Service according to the direction thereon mail matter containing correspondence addressed to VICTIM 1 (who resided in San Mateo County in the Northern District of California) for the purpose of executing, or attempting to execute, a scheme or artifice to defraud VICTIM 1 and other investors or a scheme and artifice to obtain money or property from VICTIM 1 and other investors through false or fraudulent pretenses, representations, or promises regarding the use to which those funds would be put.  As set forth in more detail above, the evidence in this case shows that a large portion of funds traceable to VICTIM 1's investment were used – almost immediately – for purposes inconsistent with the representations made to VICTIM 1 in the PPM provided to VICTIM 1 by RODRIGUEZ, which were that the investors' funds would be used solely for making a loan to 4850.

      I declare under penalty of perjury that the above is true and correct to the best of my knowledge and belief.


_____/s/_____
Jason E. Richards
Special Agent
Federal Bureau of Investigation


Sworn to and subscribed before me this \_\_28th\_\_ day of July, 2020.

By telephone

_____
HONORABLE JACQUELINE SCOTT CORLEY
UNITED STATES MAGISTRATE JUDGE